**Woodrow W. SMITH, Administrator of the Estate of Mary Elizabeth Smith, Deceased and Individually,**

v.

**HOBBY LOBBY STORES, INC.**

v.

**BOTO CO., LTD. and Everstar Merchandise Co., Ltd.**

**Civil No. 96–5146.**

United States District Court, W.D. Arkansas, Fayetteville Division.

June 25, 1997.

---

4. Docket No. 8.

5. Docket No. 12.

Mike D. Beebe, A. Watson Bell, Lightle, Beebe, Raney & Bell, Searcy, AR, Howard L. Slinkard, Rogers, AR, Brian Wood, Roy & Lambert, Springdale, AR, for Woodrow W. Smith.

Kendall B. Jones, Fort Smith, AR, for Hobby Lobby.

David McCune, Don Taylor, Davis, Cox & Wright, Fayetteville, AR, for Everstar.

Michael Shannon, Rose Law Firm, Little Rock, AR, for Boto.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This case is currently before the court on the motion of Boto Co., Ltd., to dismiss all claims against it. Boto contends the court lacks personal jurisdiction over it.

### Background.

This wrongful death action was filed on August 9, 1996, in the Circuit Court of Benton County, Arkansas by Woodrow Smith, individually and in his capacity as administrator of the estate of Mary Elizabeth Smith. The complaint alleges that on December 12, 1995, Woodrow and Mary Elizabeth Smith purchased a seven and one-half foot artificial Christmas tree and three 100–bulb strands of electric Christmas lights from Hobby Lobby Store No. 55, in Rogers, Arkansas.

On December 18, 1995, a fire occurred at the Smith residence. It is alleged that the fire began in the vicinity of the artificial Christmas tree. The fire destroyed the Smith home and Mary Elizabeth died from injuries sustained during the fire. This wrongful death products liability case was filed as a result of the occurrence. The complaint alleges Hobby Lobby is liable under various theories including negligence, breach of warranty, and strict liability.

Hobby Lobby sought and was granted leave to file a third-party complaint against Boto and Everstar Merchandise Co., Ltd. The third-party complaint alleges that Boto was the manufacturer and supplier of the artificial Christmas tree. Hobby Lobby seeks indemnity from Boto as a manufacturer pursuant to Ark.Code Ann. § 16–116–107 (1987).

Boto is a foreign corporation which does business in Hong Kong. Boto has no agent for service of process in Arkansas. Boto contends that the mere fact that it manufactured the tree [1] and distributed it to Hobby Lobby Stores, Inc., does not provide a sufficient basis for personal jurisdiction.

By memorandum opinion and order entered on February 28, 1997, the court granted Boto's motion to dismiss the third-party complaint filed by Hobby Lobby. We found that Hobby Lobby had advanced no facts tending to show that this court had personal jurisdiction over Boto.

Subsequently, the court allowed Hobby Lobby to file an amended third-party complaint against Boto and Everstar also assert-

---

1. Boto states it is unclear at this time whether or not it manufactured the tree in question. However for purposes of this motion, Boto assumes it manufactured the tree in question.

ing claims against Boto. The court concluded the only "fair thing" to do was to allow Hobby Lobby to attempt once again to assert a claim against Boto. This was true because by that point in time Everstar had asserted claims against Boto and plaintiffs had sought leave to assert claims against Boto and Everstar. By order entered on March 13, 1997, the court took the issue of Boto's amenability to suit under advisement and directed the parties to conduct expedited discovery on this issue. The issue is now ready for resolution.

### Discussion.

■ "When personal jurisdiction is challenged, the plaintiff has the burden to show jurisdiction exists." *Burlington Industries, Inc. v. Maples Industries,* 97 F.3d 1100, 1102 (8th Cir.1996) (citation omitted). "[A] complaint should not be dismissed for want of jurisdiction, before trial, if there is any genuine issue as to any fact material to the jurisdictional question." *Radaszewski v. Telecom Corp.,* 981 F.2d 305, 309 (8th Cir.1992). "While the facts adduced in a Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction must be viewed in the light most favorable to the party opposing the motion, there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist, thereby casting the burden upon the moving party to demonstrate a lack of personal jurisdiction." *Aaron Ferer & Sons Co. v. Diversified Metals Corp.,* 564 F.2d 1211, 1215 (8th Cir.1977). *See also Dakota Industries, Inc. v. Ever Best Ltd.,* 28 F.3d 910, 915 (8th Cir.1994) (The nonmoving party need only make a prima facie showing of jurisdiction).

The Arkansas long-arm statute formerly provided certain listed bases for personal jurisdiction. Ark.Code Ann. § 16–4–101 (Repl.1994). The long-arm statute has been amended and now provides that "[t]he courts of this state shall have personal jurisdiction of all persons, and all causes of action or claims for relief, to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark.Code Ann. § 16–4–101(B) (Supp.1995).

■ Even before this amendment, Arkansas's long-arm statute had been interpreted to extend to the limits of federal due process. *Kilcrease v. Butler,* 293 Ark. 454, 455, 739 S.W.2d 139 (1987) (citations omitted). Thus the sole question is whether the exercise of personal jurisdiction is consistent with the due process clause. *Bell Paper Box, Inc. v. Trans Western Polymers, Inc.,* 53 F.3d 920, 921 (8th Cir.1995); *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612 (8th Cir.1994).

■ "The test for due process is whether there are sufficient 'minimum contacts' between the nonresident defendant and the forum state so that the assertion of personal jurisdiction over the nonresident defendant is consistent with traditional notions of fair play and substantial justice." *Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677 F.2d 651, 654 (8th Cir.1982), *citing, World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

> Sufficient contacts exist when the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice. In assessing the defendant's "reasonable anticipation," there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.,* 950 F.2d 526, 528–29 (8th Cir.1991) (citations and internal quotation marks omitted).

■ The Court of Appeals for the Eighth Circuit has determined that satisfaction of the due process standard may be measured by weighing the following factors: the nature and quality of defendant's contacts with the forum state; quantity of contacts; source and connection of the cause of action with those contacts; and, to a lesser degree, the interest of the forum state in providing a forum for its residents; and the convenience

of the parties. *Aftanase v. Economy Baler Co.,* 343 F.2d 187 (8th Cir.1965).

The focus of the inquiry is on the relationship "among the defendant, the forum, and the litigation." *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). As the Supreme Court has stated on more than one occasion, the determination of whether minimum contacts exist "is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'" *Kulko v. California Superior Ct.,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) (*quoting Estin v. Estin,* 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948)).

Following the Supreme Court's decision in *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 1872 nn. 8 & 9, 80 L.Ed.2d 404 (1984) the Eighth Circuit "elaborated on the third factor (the relationship of the cause of action to the contacts), distinguishing between specific jurisdiction and general jurisdiction." *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994) (citation omitted).

> "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state," while "[g]eneral jurisdiction ... refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose."

*Id.* at 819 (citations omitted). *See also Burlington Industries, Inc. v. Maples Industries,* 97 F.3d 1100, 1103 (8th Cir.1996).

Boto contends it is not subject to suit in Arkansas. It asks the court to consider the following facts: (1) Boto is a foreign corporation doing business in Hong Kong; (2) it is not authorized to do business in Arkansas; (3) it has no United States customers with a principal place of business in Arkansas for the five years preceding this lawsuit; (4) all sales made to customers in the United States are sold on FOB (free on board) Hong Kong terms—at the customer's direction and cost, Boto arranges for the products to be loaded on shipping liners in Hong Kong bound for a port of the customer's choosing; (5) Boto has no knowledge regarding the method or manner of any further transportation or distribution of the products made by its customers; (6) no employee, representative, or agent of Boto has ever set foot in Arkansas or negotiated any sales with corporations located in Arkansas; (7) all contact between Hobby Lobby and Boto has been in Oklahoma or between Hong Kong and Oklahoma; (8) Boto makes no effort to study the United States market but does receive requests for products and features in Hong Kong directly from its customers; and (9) it does not have a distribution system—fifty percent of its sales in the United States are through direct channels, the remaining sales are through a third-party importer.

After the filing of this lawsuit, Boto has received two purchase orders relating to Wal–Mart. The orders came from Pacific Resources Export, Limited, a Hong Kong company. This company apparently has authority to purchase products for Wal–Mart. However, Boto has only dealt with Pacific Resources.

Boto also offers the affidavit of its managing director, Michael Kao, who has for the past few years traveled to Hobby Lobby's headquarters in Oklahoma City, Oklahoma. Mr. Kao travels to the United States once a year for both personal and business reasons. During these trips, he makes contact with several of Boto's major customers, including Hobby Lobby. Kao states: (1) he has never visited the State of Arkansas and has had no dealings with any persons in Arkansas; (2) he was not aware that Hobby Lobby had any stores in Arkansas nor was he aware of the location of Arkansas in the United States until this lawsuit; (3) he recalls seeing a map of the United States in a corridor adjacent to a meeting room in Hobby Lobby's Oklahoma office; (4) the products sold to Hobby Lobby were placed on an ocean liner by Boto in Hong Kong destined at Hobby Lobby's cost and direction for a port in the United States; (5) he has no knowledge of how or where the products were distributed or sold by Hobby Lobby; (6) he has no knowledge of whether any products purchased by Hobby Lobby

were resold in Arkansas; and (7) he has not discussed the method or manner of distribution of products purchased from Boto by Hobby Lobby with any representative of Hobby Lobby.

In opposition, the parties asserting that jurisdiction over Boto exists, Hobby Lobby (third-party plaintiff), Everstar (cross-claimant), Woodrow Smith, Administrator of the Estate of Mary Elizabeth Smith (plaintiff), and State Farm Fire & Casualty Company (plaintiff),[2] inform the court that the gross amount of Boto manufactured products sold in the United States (in Hong Kong dollars) was $187 million for the year ending March 31, 1993, $171 million for the year ending March 31, 1994, $241 million for the year ending March 31, 1995, $328 million for the year ending March 31, 1996, and $415 million for the year ending March 31, 1997. The court's attention is also drawn to the fact that Kao testified that it was foreseeable that Boto's products could end up in any state in the United States.

By affidavit, David Green, president of Hobby Lobby, states: (1) Hobby Lobby first established a store in Arkansas in 1984; (2) Hobby Lobby began purchasing from Boto in approximately 1985; (3) he has had "face-to-face discussions and conversations with Michael Kao ... in our home office in Oklahoma City"; (4) since Boto began soliciting Hobby Lobby's business, "there has been a map on display at our home office ... which map has marks and tags which indicate the cities in which we have stores and which indicate the states these stores are in as well as circles around the cities and states in which we have stores;" (5) "Michael Kao has seen this map (which includes Arkansas) and we have discussed our continuing growing business ... as we have continued to grow by adding stores in other states (geographically surrounding Arkansas) as well as additional stores in the state of Arkansas;" (6) in January, 1995, Hobby Lobby purchased 7.5 foot non-flocked green artificial Christmas trees from Boto which were distributed to all ten stores in Arkansas; (7) the only 7.5 foot non-flocked Christmas trees that Hobby Lobby purchased in 1993 through 1995 were from Boto; (8) the only Christmas trees distributed to Hobby Lobby stores were purchased direct from Boto out of their Hong Kong office, shipped by ocean liner to California, transported to a warehouse in Dallas, and then transferred to a warehouse in Oklahoma City where they were distributed; (9) he is "confident that Michael Kao of Boto ... was aware that Boto'[s] ... trees would be distributed to our stores in Arkansas and those trees sold by our stores in Arkansas thereby generat[e] revenue to Boto ... from the sale of these trees in Arkansas;" (10) he is "confident" that Michael Kao has known since 1985 the trees it sold Hobby Lobby were distributed among "all our stores including the stores we had in Arkansas;" (11) in 1995 Boto was aware that we had stores in nine states, all of which surround Arkansas; (12) in 1995 Hobby Lobby did $2.3 million worth of business with Boto and purchased 101,100 trees; (13) in 1996 Hobby Lobby did an estimated $3.0 million worth of business with Boto; (14) "[i]t is my information that Boto ..., has in the past, including calendar year 1995, sold directly or through a distributor to national chain stores, Target and K-Mart, both of which have numerous stores in Arkansas;" (15) it is my information that Boto is currently selling to Wal–Mart whose home office is in Bentonville, Arkansas; (16) Hobby Lobby receives at its home office a monthly trade publication entitled *Hong Kong Enterprise* in which Boto advertises and which is also available on the Internet at HTTP://www.tdc.org.hk; and (17) while at Boto's home office in Hong Kong on April 17, 1997, he saw shipments in boxes with a stamped destination of Bentonville, Arkansas.[3]

In his second affidavit, Green made the following statements regarding his conversations with Kao at Hobby Lobby's home office:

> When Michael Kao is in our home offices on his annual visits he has asked questions and we have answered them and discussed

---

**2.** For simplicity's sake the court will refer collectively to these parties as the plaintiffs.

**3.** Gary Jech, a buyer for Hobby Lobby, also saw the shipping boxes "stamped for destination labeled 'Bentonville, Arkansas.'"

at length our business, our business relationship with Boto Co., Ltd., number of stores we have in which Boto Co., Ltd.'s products are sold, our sales volume in terms of quantity and dollars of trees sold, and I have told him and showed him on our map, on several occasions, the number of states we operate in and have stores in, how we are growing in sales and stores, which is directly related in part to our growing increase in business in terms of dollars and volume with Boto Co., Ltd.

All parties cite to and rely on cases dealing with the stream of commerce theory. As we noted in our prior opinion, the stream of commerce theory of personal jurisdiction is merely a type of specific jurisdiction. *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 612 (8th Cir.1994). *See also Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The theory provides an "analytical tool useful in cases in which the defendant's contacts are the result of establishing a distribution network in the forum State for the sale of defendant's products...." *Viam Corp. v. Iowa Export–Import Trading Co.*, 84 F.3d 424, 427 (Fed.Cir. 1996).

*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) has been cited for the proposition that personal jurisdiction may follow a product if it is delivered "into the stream of commerce with the expectation that [it] will be purchased by consumers in the forum state." The Supreme Court in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) discussed the stream of commerce theory. However, the court in assessing minimum contacts produced three opinions. In Justice O'Connor's opinion, she rejected that idea that the language in *World–Wide Volkswagen* might be read to allow jurisdiction over any manufacturer that is aware that its product may be sold in the forum state.

Justice O'Connor noted that some courts had rejected this broad reading of *World–Wide*. Instead, those courts have read *World–Wide* to require more of the defendant than mere knowledge of the product's entry into the forum state through the stream of commerce. She stated:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum States. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J.).

In *Barone v. Rich Bros. Interstate Display Fireworks*, 25 F.3d 610 (8th Cir.1994), the Eighth Circuit discussed the concept. In that case Barone was injured in Nebraska when a fireworks display he was helping set up went awry. Barone sued the distributor of the fireworks, Rich Brothers, and the manufacturer, Hosoya Fireworks Co. of Tokyo, Japan. Hosoya moved to dismiss for lack of personal jurisdiction. The district court granted the motion and the Eighth Circuit reversed.

Hosoya had no agent for service in Nebraska, no office in Nebraska, and no distributor in Nebraska. It did not advertise in Nebraska or directly send any products in Nebraska. Hosoya sold products throughout the United States by utilizing nine distributors in six states. Those nine distributors purchased between $250,000 and $1,000,000 in fireworks annually. This averaged seventy percent of Hosoya's fireworks business.

Rich Brothers purchased about $100,000 annually. About sixteen percent of the fireworks purchased were eventually resold into Nebraska. Rich Brothers sold fireworks displays through its six regional salesmen and

through a catalog by mail. One of the six salesmen was located in Nebraska. The fireworks displays were intended for use by municipalities or organizations.

The Eighth Circuit cited *Giotis v. Apollo of the Ozarks, Inc.,* 800 F.2d 660 (7th Cir. 1986) in which the court held that "[a] seller at the head of a distribution network thus satisfies the requisite foreseeability of due process where it 'delivers its products into the stream of commerce with the expectation that [these products] will be purchased by consumers in the forum state.' "

The Eighth Circuit stated that, if *Giotis* was the law, applying it to the facts of the case before it was quick work. It noted:

> Hosoya certainly benefited from the distribution efforts of Rich Bros., and although Hosoya claims to have had no actual knowledge that Rich Bros. distributed fireworks in Nebraska, such ignorance defies reason and could aptly be labeled "willful." South Dakota is not a particularly populous state; Sioux Falls is conveniently located within short distance of three other states, and the very name of the distributor is "Rich Bros. *Interstate* Display Fireworks Co." In addition, the location of Hosoya's distributors suggests an effort to reach much of the country through a limited number of regional distributors.

*Barone,* 25 F.3d at 614. It noted that "Hosoya had managed to cover the Midwest rather successfully, and it is difficult to imagine that such strategically placed distributors would be chosen merely by chance. Rather, it is evidence of Hosoya's efforts to place its products in the stream of commerce throughout the Midwest and other parts of the country as well." *Id.* at 614.

The Eighth Circuit went on to decide whether *Giotis* correctly stated the law in view of *Asahi.* The court held that it did. It held that:

> Hosoya has reaped the benefits of its network of distributors, and it is only reasonable that it should now be held accountable in the forum of plaintiff's choice (as long as that choice of forum comports with due process, which we believe it does). More than reasonable foreseeability is at stake here, as it must be under existing law, for

Hosoya has purposefully reaped the benefits not only of South Dakota's laws, but of Nebraska's as well.

*Barone,* 25 F.3d at 615.

In *Asahi* it "appears that five justices agreed that continuous placement of a significant number of products in the stream of commerce with knowledge that the product would be distributed into the forum state represents sufficient minimum contacts to satisfy due process." *Barone,* 25 F.3d at 614.

Courts have not abandoned the notion that jurisdiction must be premised on activity deliberately directed toward the forum state or on proof of purposeful availment of the privilege of doing business in the forum state. *See CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996) (injection of the product into the stream of commerce, without more, would be at best a dubious ground for jurisdiction); *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir.1994) (must have engaged in some activity purposefully directed toward the forum state), *cert. denied,* 513 U.S. 1151, 115 S.Ct. 1103, 130 L.Ed.2d 1070 (1995); *Renner v. Lanard Toys, Ltd.,* 33 F.3d 277 (3d Cir.1994) (absence of direct sales or shipments is not dispositive if it appears there is some other type of activity which shows purposeful availment).

Plaintiffs concede that the Eighth Circuit has consistently held that more than mere foreseeability is required to establish personal jurisdiction over a foreign defendant. However, they contend the facts here show more than just foreseeability. They argue Kao's purported ignorance that Boto's products are distributed in Arkansas by Hobby Lobby, or other Boto customers, defies reason and is willful.

Plaintiffs contend that Boto has significant connections with Arkansas. The parties stress the fact that Boto advertises in Arkansas via the "World–Wide Web," Boto currently is shipping products marked with a destination of "Bentonville, Arkansas," and Boto sells to various nationwide distributors that maintain stores in Arkansas. It is argued that it is indisputable that Boto knew or should have known that its products were

being sold in Arkansas. Plaintiffs contend that such imputed knowledge of foreseeability can be drawn from the huge volume of business Boto does each year with national retailers and its efforts to "nurture" its business relationship with Hobby Lobby. The court is reminded that personal jurisdiction may arise without the defendant's ever stepping foot on the forum state's soil.

Plaintiffs suggest that, by selling millions of dollars worth of its product each year to the country's largest national retailers, Boto is utilizing a significant United States distribution network. Thus, they contend this case is closely akin to that presented in *Barone* and the court should deny the motion to dismiss.

■ Boto argues that sales to direct customers, even if the direct customers are nationwide retailers, are not the same as utilizing a distribution system. The court agrees. Plaintiffs have presented no evidence suggesting Boto has any input into the decision making process of its customers regarding the manner or places of distribution. Boto simply sells the goods to the customer and arranges at the customer's expense for shipping from Hong Kong. Boto knows the port of destination and nothing more. Unlike the situation in *Barone, supra*, Boto did not purposefully set up a network of distributors designed to blanket the country or a particular region of the country. It merely sold to customers who placed orders and then such customers determined where the goods would go without direction, or even input, from Boto.

With regard to the alleged sales to Wal–Mart, Boto points out it dealt only with Pacific Resources Export Limited. The labels on the boxes which referred to Bentonville, Arkansas, are "private labels" which were furnished to Boto by Pacific Resources Export Limited. By affidavit Chan Kit Fun states that Boto often sells products under a "private label" arrangement. Under this type of arrangement, the products do not bear Boto's name but will instead bear the name of the customer or some other distinguishing mark. Sometimes the identifying labels are provided by the purchaser and placed on the product boxes by Boto.

It was pursuant to this type of arrangement that the labels identifying Wal–Mart as the marketer of the trees were placed on the product boxes. The Bentonville, Arkansas, address was not an indication of the ultimate destination of the products manufactured by Boto.

■ With regard to the advertising on the "World Wide Web," Boto states the Internet address does not contain any advertising or listing for Boto. Further it argues that the mere advertisement on the Internet surely does not mean that a company is subject to personal jurisdiction at each and every location on the planet where someone is capable of logging on the Internet. Finally, Boto points out that plaintiffs have provided no evidence that any advertising done by Boto in the Hong Kong Enterprise magazine was directed at or designed to reach Arkansas or in fact has ever found its way to Arkansas.

In the case of *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996) the court considered the impact on the Internet in the context of analyzing the existence of personal jurisdiction over an individual who operated a business over the Internet. The court noted that:

> [t]he Internet represents perhaps the latest and greatest manifestation of these historical, globe-shrinking trends. It enables anyone with the right equipment and knowledge ... to operate an international business cheaply, and from a desktop. That business operator, however, remains entitled to the protection of the Due Process Clause, which mandates that potential defendants be able "to structure their primary conduct with some minimum assurance as to where the conduct will and will not render them liable to suit."

*CompuServe*, 89 F.3d at 1262, *citing, World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. In *CompuServe*, Patterson was a third-party provider of software who used CompuServe to market his wares in Ohio and elsewhere. CompuServe was an Ohio based business. Under the circumstances, the court held Patterson subject to suit in Ohio.

The court was careful to state it was not holding that Patterson would be subject to suit in any state where his software was purchased; nor did it hold that CompuServe could sue any "regular subscriber of its service for nonpayment in Ohio, even if the subscriber is a native Alaskan who has never left home." *CompuServe*, 89 F.3d at 1268.

In *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa.1997) the court discussed in detail the impact of the Internet on the personal jurisdiction analysis. The court conducted a review of the cases and other materials and stated that this review:

> reveals that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportional to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* at 1124 (citations omitted). *See also Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F.Supp. 456 (D.C.Mass.1997); *Heroes, Inc. v. Heroes Foundation*, 958 F.Supp. 1 (D.D.C.1996).

In this case, at the most, Boto's advertisement in a trade publication appears on the Internet. Boto did not contract to sell any goods or services to any citizens of Arkansas over the Internet site. Thus, the court finds that the alleged Internet posting by or in behalf of Boto is simply an insufficient "contact" with Arkansas to support haling this Hong Kong business into the courts of Arkansas.

This is not a case like *Barone* in which "defendant poured its products into regional distributors throughout the country...." *Barone*, 25 F.3d at 615. Neither the Eighth Circuit in *Barone* nor the Supreme Court in *Asahi* has given the stream of commerce theory the breadth suggested by plaintiffs. The courts have not abandoned the notion that jurisdiction must be premised on activity deliberately directed toward the forum state or on proof of purposeful availment of the privilege of doing business in the forum state. *See also Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939 (4th Cir.1994), *cert. denied*, 513 U.S. 1151, 115 S.Ct. 1103, 130 L.Ed.2d 1070 (1995); *Renner v. Lanard Toys, Ltd.*, 33 F.3d 277 (3d Cir.1994).

■ After considering the relevant factors, we find that plaintiffs have failed to set forth a prima facie case that personal jurisdiction over Boto exists. Plaintiffs have shown no contact with the State of Arkansas other than the fact that Boto's customer, Hobby Lobby, and perhaps other Boto customers, distributed Boto's goods to its stores in Arkansas. Hobby Lobby is not a distributor of Boto's products; rather, Hobby Lobby is itself a retailer. It purchases products, the court assumes, from any number of companies. These products in turn are distributed by Hobby Lobby to its retail outlets. Plaintiffs have made no showing that Boto is involved in any manner in creating or maintaining this distribution system or even has any specific knowledge of Hobby Lobby's distribution system. A non-resident manufacturer is not subjected to the jurisdiction of each state in which its product ends up. There must be some showing that the manufacturer purposefully availed itself of the privilege of doing business in the forum state or in some manner directed its activities at the forum state. The type of activity re-

**1366**

quired to satisfy the Due Process Clause is simply lacking in this case.

***Conclusion.***

For the reasons stated, the motion to dismiss will be granted by a separate order entered concurrently herewith.